**FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**FILED**

MAY 10 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

CLARENCE WAYNE DIXON,

            Petitioner-Appellant,

v.

DAVID SHINN, Director, Arizona
Department of Corrections,

            Respondent-Appellee.

No.   22-99006

D.C. No. 2:14-cv-00258-DJH

OPINION

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted May 10, 2022
San Francisco, California

Before: Jay S. Bybee, Daniel A. Bress, and Danielle J. Forrest, Circuit Judges.

Opinion by Judge Bress

BRESS, Circuit Judge:

Clarence Dixon, an inmate incarcerated on death row in Arizona who is set to be executed on May 11, 2022, appeals the denial of his federal habeas petition and seeks a stay of his execution. He challenges an Arizona state court's determination that he is competent to be executed. We conclude that the Arizona state court's

1

decision is not contrary to or an unreasonable application of clearly established federal law, nor does it result in a decision that was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)–(2). Dixon is therefore not entitled to relief.

I

In June 1977, Dixon was charged in Arizona state court with assault with a deadly weapon after he struck a teenage girl with a metal pipe. *Dixon v. Ryan*, 932 F.3d 789, 796 (9th Cir. 2019). After Dixon waived his right to a jury trial, the court found him not guilty by reason of insanity and ordered him released on January 5, 1978. *Id.* The next day, Deana Bowdoin, a 21-year-old student at Arizona State University, was found dead in her apartment with a belt tightly cinched around her neck. *State v. Dixon*, 250 P.3d 1174, 1177–78 (Ariz. 2011). Bowdoin had been restrained, strangled, and stabbed several times. *Id.* Investigators also found semen in Bowdoin's vagina and on her clothing. *Id.* Bowdoin's murder would remain unsolved for nearly twenty-five years.

In 1985, Dixon violently sexually assaulted a student at Northern Arizona University (NAU) who was out jogging, dragging her into a forest and forcing her to engage in numerous sexual acts at knifepoint. *State v. Dixon*, 735 P.2d 761, 762 (Ariz. 1987). After a jury trial, Dixon was convicted of aggravated assault,

2

kidnapping, sexual abuse, and four counts of sexual assault. *Id.* at 765. He received a consecutive life sentence on each count. *Id.* at 766.

Dixon's DNA was obtained during the police investigation into this 1985 assault. *Dixon*, 932 F.3d at 796. Many years later, in 2001, a detective ran the DNA recovered from Bowdoin's murder and found a match with Dixon, who had lived across the street from Bowdoin at the time of her murder. *Dixon*, 250 P.3d at 1177. There was no indication of previous contact between the two. *Id.* at 1177–78.

In November 2002, Dixon was indicted for first-degree murder, or, alternatively, first-degree rape and felony murder for the death of Bowdoin. *Dixon*, 932 F.3d at 796. Dixon moved to change counsel and later to waive his right to counsel. *Id.* at 797. He explained that he wished to pursue a legal theory that counsel had determined was not viable, specifically, that the DNA evidence should be suppressed because it was illegally obtained by NAU campus police in connection with his 1985 assault conviction. *Id.* at 797, 803. The trial court determined that Dixon "understood the charges against him" and "the potential penalties for the crime." *Id.* at 797. Dixon informed the court that "he was not aware of any current mental health issues that would prevent him from proceeding to trial." *Id.* Dixon's counsel agreed with this assessment, and the court allowed Dixon to represent himself. *Id.* at 797–98.

3

On January 15, 2008, the jury convicted Dixon of premeditated murder and felony murder and later sentenced him to death. *Id.* at 799. The Arizona Supreme Court affirmed on direct appeal, *State v. Dixon*, 250 P.3d 1174 (Ariz. 2011), and the Supreme Court denied Dixon's petition for writ of certiorari, *Dixon v. Arizona*, 565 U.S. 964 (2011).

On March 18, 2013, represented by counsel, Dixon filed a state habeas petition. *Dixon*, 932 F.3d at 800. The trial court (the same judge that had presided over Dixon's trial) denied relief. As relevant here, the court rejected Dixon's claims that his counsel was ineffective in failing to challenge Dixon's competency to waive counsel, or that the court had violated Dixon's due process rights by failing to hold a competency hearing *sua sponte*. *Id.* at 800, 804. Among other things, the court noted that Dixon was "coherent and rational," "able to adequately advance his positions," "cogent in his thought processes," and "lucid in argument." The Arizona Supreme Court summarily denied Dixon's petition for review. *Id.* at 800.

On December 19, 2014, Dixon filed a federal habeas petition under 28 U.S.C. § 2254. The district court denied the petition, and we affirmed. *Id.* at 795. On Dixon's claim of ineffective assistance of counsel, we held that the Arizona state court had not unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), because "the record contains no evidence of competency issues at any time throughout the course of the[] proceedings." *Id.* at 802–03. The Supreme Court

4

again denied Dixon's petition for writ of certiorari. *Dixon v. Shinn*, 140 S. Ct. 2810 (2020).

Dixon's execution was later set for May 11, 2022. On April 8, 2022, Dixon requested a hearing in Arizona state court on his competency to be executed. At the hearing, both Dixon and the State presented expert testimony, and the parties also submitted thirty-nine exhibits. Dr. Carlos Vega testified for the State, and Dr. Lauro Amezcua-Patiño testified for Dixon. Both experts also submitted reports. After hearing the evidence, the Arizona Superior Court found that Dixon failed to prove he was incompetent to be executed. The Arizona Supreme Court declined jurisdiction over Dixon's petition for review of the Superior Court's decision.

On May 9, 2022, Dixon filed a federal habeas petition under 28 U.S.C. § 2254 challenging the state court's competency determination. Dixon also filed an accompanying motion to stay his execution. The district court denied relief on May 10, 2022. Dixon now appeals. We granted a certificate of appealability. 28 U.S.C. § 2253(c)(1).[1]

II

We review de novo the district court's denial of Dixon's § 2254 petition. *Bolin v. Davis*, 13 F.4th 797, 804 (9th Cir. 2021).

---

[1] We grant Dixon's motion to transmit a physical exhibit. Dkt. No. 13.

5

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) generally prohibits state prisoners from filing "second or successive" federal habeas petitions unless "certain narrow requirements" are met. *Jones v. Ryan*, 733 F.3d 825, 834 (9th Cir. 2013). However, "the provisions of AEDPA addressing 'second or successive' petitions" do not apply to a § 2254 application based on alleged incompetency to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986). *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) (quoting 28 U.S.C. § 2244(b)). Because this is the only claim Dixon raises in his § 2254 petition, his petition is not barred as second or successive under AEDPA.

We must nonetheless evaluate Dixon's claim under AEDPA's "highly deferential" standards of review. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). A § 2254 petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings," unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When, as here, the decision of the highest state court is unreasoned, we "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale," and

"presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

The standard established by AEDPA is "intentionally 'difficult to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)). To prevail under § 2254(d)(1), "a prisoner must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam)). Rather, the question is whether "the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, the state court's application of clearly established federal law "must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Similarly, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

We conclude that Dixon has not demonstrated that he is entitled to relief either under § 2254(d)(1) or § 2254(d)(2).

A

Dixon first argues that the Arizona state court's rejection of his incompetency claim was an unreasonable application of *Panetti v. Quarterman*, 551 U.S. 930

7

(2007), and *Ford v. Wainwright*, 477 U.S. 399 (1986). In those cases, the Supreme Court held that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane," *Ford*, 477 U.S. at 410, which is determined according to whether the prisoner's "mental illness deprives him of the mental capacity to understand that he is being executed as a punishment for a crime," *Panetti*, 551 U.S. at 954 (quotation marks and alterations omitted). "The critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for his execution.'" *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (alterations omitted) (quoting *Panetti*, 551 U.S. at 958–59). Stated another way, "the sole inquiry for the court [is] whether the prisoner can rationally understand the reasons for his death sentence." *Id.* at 728.

In this case, the state court correctly articulated the governing legal standard and asked whether Dixon "lacks a rational understanding of the State's rationale for his execution." The court ultimately concluded that Dixon had not made this showing because, although Dixon "has a mental disorder or mental illness of schizophrenia," this illness "can fall within a broad spectrum" and does not on its own "decide the question of competency." *See also Madison*, 139 S. Ct. at 727 ("What matters is whether a person has the 'rational understanding' *Panetti* requires—not whether he has any particular memory or any particular mental

8

illness."). The state court further found that Dixon's intelligence was "high-average," and that he had shown "sophistication, coherent and organized thinking, and fluent language skills in the pleadings and motions that he has drafted."

In addition, the court found that "there were persuasive observations that were also offered by Dr. Vega," including Dixon's statement that "if he had a memory of the murder, he would have a sense of relief on his way to his execution," which demonstrated that Dixon understood the execution to be a punishment for the crime of conviction. As Dr. Vega had further described in his expert report,

> Clarence is so well aware of the State's rationale for his execution that he wishes he resided in a different State, one that did not have the death penalty. He also made it clear that he does not want to die and believes that there is nothing to be gained by his execution. He even goes as far as to say that if he could bring the victim back to life, he would. He made it clear that he was "going to fight [his execution] until the end." He has deluded himself into believing that he found case law[] that supports his position.

Dr. Vega also testified that based on his interview of Dixon, he observed that Dixon was "not the one least bit delusional" and had a "very good grasp of reality." Dixon also stated to his own expert Dr. Amezcua-Patiño that state officials were "not disagreeing" with his legal challenge to his conviction, "they just want to kill me for murder." As the district court noted, although the experts disagreed on the ultimate competency question, "[t]he experts agree that Dixon knows that he was sentenced to death for the murder of Deana Bowdoin."

9

Dixon has not demonstrated it was objectively unreasonable for the state court to conclude that he is competent to be executed in light of the full record before it. "[E]ven if 'reasonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's determination.'" *Wood*, 558 U.S. at 301 (alterations omitted) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). A fairminded jurist could conclude that Dixon had not shown an inability to "reach a rational understanding of the reason for the execution." *Panetti*, 551 U.S. at 958.

Dixon primarily argues that the state court erred by giving insufficient weight to his "delusional, psychotic-driven belief" that his conviction was invalid because the 1985 DNA evidence was obtained unlawfully by NAU police and should have been suppressed. Dixon further points to his belief that the legal system has not credited his suppression argument because it is biased against him, in the interest of protecting NAU and government entities from embarrassment. However, the state court addressed this argument, explaining that while Dixon's "favored legal theory" was "highly improbable," this was not "dispositive of the issue before this Court," which was whether Dixon was competent to be executed.

Dixon cites no clearly established federal law suggesting that having long-shot legal theories or viewing the legal system as biased in favor of law enforcement, or even corrupt, is coextensive with the finding that *Ford* and *Panetti* require. *See*

10

*Madison*, 139 S. Ct. at 729 ("[D]elusions come in many shapes and sizes, and not all will interfere with the understanding that the Eighth Amendment requires."). We therefore cannot conclude that the state court's decision was an unreasonable application of *Panetti*. That is particularly so when we have already rejected a substantially similar argument: that Dixon's insistence on the DNA suppression theory demonstrated his incompetence at trial. Dixon raised this argument in his federal habeas proceedings, and it failed. *See Dixon*, 932 F.3d at 803 ("As to Dixon's continued interest in the DNA suppression issue . . . Dixon's interest in the issue was not so bizarre or obscure as to suggest that Dixon lacked competence."); *see also Dixon*, 2016 WL 1045355, at *9 ("'Criminal defendants often insist on asserting defenses with little basis in the law, particularly where, as here, there is substantial evidence of their guilt,' but 'adherence to bizarre legal theories' does not imply incompetence." (quoting *United States v. Jonassen*, 759 F.3d 653, 660 (7th Cir. 2014))).

For these reasons, Dixon has not demonstrated that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

### B

We also reject Dixon's argument that the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

11

*First*, Dixon argues that Dr. Vega's testimony and assessment of Dixon were erroneous in several respects. He maintains that because Dr. Vega opined that Dixon does not suffer from paranoid schizophrenia when the state court concluded that he does, Dr. Vega was therefore incapable of assessing whether Dixon could understand the State's reasons for his execution. In Dixon's view, only Dr. Amezcua-Patiño's testimony was valid, and because it was allegedly uncontested, the state court unreasonably failed to adopt Dr. Amezcua-Patiño's conclusions.

The state court concluded that Dixon had not shown he was incompetent to be executed. And Dixon has not demonstrated that the state court's use of Dr. Vega's observations reflects an unreasonable determination of the facts. Both Dr. Vega and Dr. Amezcua-Patiño agreed that paranoid schizophrenia, or delusional thoughts alone, would not be dispositive of Dixon's competency claim. It was not unreasonable for the state court to agree with Dr. Amezcua-Patiño that Dixon suffered from schizophrenia and delusions, but to also find that Dixon was rationally capable of understanding the State's reason for his execution. Dixon has not demonstrated how the state court made incompatible findings on this score. *Cf. Otte v. Houk*, 654 F.3d 594, 606 (6th Cir. 2011) (holding that a state court's determination was not objectively unreasonable because "the state court's decision to credit one expert over another is entitled to great deference," and the petitioner had "offered

12

little more than competing testimony" to show that the State's expert's opinions were unsound).

Dixon points to other alleged shortcomings in Dr. Vega's opinion and analysis, but these do not render the state court's factual findings unreasonable. For example, Dixon takes issue with the length of Dr. Vega's interview of him, the fact that it was conducted by video, that Dr. Vega did not retain an audio recording of the interview after he had prepared and submitted his report, that Dr. Vega did not directly ask him about his understanding of why he was to be executed, and that Dr. Vega discounted the value of Dixon's neuropsychological test results. But none of these points, singularly or in combination, made it unreasonable for the state court to credit Dr. Vega's observations and conclude that Dixon is competent to be executed based on the entirety of the evidence. That is particularly so under AEDPA's "highly deferential" standard of review, which "demands that state-court decisions be given the benefit of the doubt." *Renico*, 559 U.S. at 773 (first quoting *Lindh*, 521 U.S. at 333 n.7; then quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

*Second*, Dixon objects to the state court's discussion of his high-average intelligence and his coherent and organized writings. Dixon argues that intelligence does not reduce the effects of serious psychotic illnesses or relieve paranoid schizophrenics from hallucinations, including in cases like his. As evidence of his

delusional beliefs, Dixon principally points to two handwritten letters he addressed to the Arizona Judicial Commission in April 2022, demanding the disbarment of the members of the Arizona Supreme Court.

The state court's reliance on Dixon's writings and his intelligence level was not objectively unreasonable. Dixon points to no authority demonstrating that these were improper considerations in assessing Dixon's competency to be executed. And the state court expressly recognized that Dixon's intelligence and coherent writings also did not "preclude" a finding of incompetence.

*Third*, Dixon challenges the state court's reliance on his statement to Dr. Vega that he would likely feel "relief" if he regained his memory of the murder. Specifically, Dr. Vega stated: "[W]hen Clarence was asked, hypothetically, how he would feel if he were to suddenly have a memory of having killed her," "he replied that if he were to recall having murdered that girl, he would have a sense of relief on his way to his execution." Dixon argues that this statement is irrelevant to whether he rationally understands the State's reasons for his execution. Dixon also questions the reliability of Dr. Vega's recitation of the statement.

Dixon does not directly argue that he did not make the challenged statement to Dr. Vega in their interview, and the state court could thus reasonably conclude that Dixon had made the statement as reproduced in Dr. Vega's report and referenced in his later testimony. The state court could also reasonably rely on the statement as

14

evidence that Dixon is capable of rationally understanding the reason for his execution. *Cf. Madison*, 139 S. Ct. at 731 ("[U]nder *Ford* and *Panetti*, the Eighth Amendment may permit executing [petitioner] even if he cannot remember committing his crime.").

As stated above, the ultimate question is "whether [Dixon] can rationally understand the reasons for his death sentence." *Id.* at 728. The state court's conclusion that Dixon does have this understanding was not based upon an unreasonable determination of the facts.

\*　　\*　　\*

For the foregoing reasons, the judgment of the district court is affirmed, and Dixon's motion for a stay of execution, Dkt. No. 9, is denied.

**AFFIRMED; Motion for Stay of Execution DENIED.**