**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLARENCE WAYNE DIXON,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN, Warden,
Director, Arizona Department of
Corrections; RON CREDIO, Warden,
Arizona State Prison - Eyman
Complex,

*Respondents-Appellees.*

No. 16-99006

D.C. No.
2:14-cv-00258-
DJH

OPINION

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted November 14, 2018
San Francisco, California

Filed July 26, 2019

Before: Sidney R. Thomas, Chief Judge, and Susan P.
Graber and Sandra S. Ikuta, Circuit Judges

Opinion by Chief Judge Thomas

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Clarence Wayne Dixon's habeas corpus petition challenging his Arizona state murder conviction and death penalty.

The panel applied deferential review under the Antiterrorism and Effective Death Penalty Act of 1996.

The panel held that the district court properly held that Dixon's Sixth Amendment right to effective assistance of counsel was not violated when his trial counsel elected not to challenge Dixon's competency to waive counsel, despite counsel's knowledge that Dixon had a history of mental health issues. The panel held that the Arizona Superior Court's denial of Dixon's petition for post-conviction relief did not unreasonably apply *Strickland v. Washington*, 466 U.S. 668 (1984), and that the record demonstrates that the Arizona Superior Court did not rely on an unreasonable determination of the facts.

The panel held that the district court properly concluded that Dixon's due process rights were not violated by the state trial court's failure to hold a competency hearing *sua sponte*. The panel held that the state post-conviction-relief court's determination without a hearing that Dixon was competent to waive counsel and represent himself was not an unreasonable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

determination of the facts, nor was it contrary to clearly established law.

The panel held that the district court properly held that the Arizona Supreme Court's opinion concluding that the trial court did not abuse its discretion in denying Dixon's final request for a continuance was neither contrary to, nor an unreasonable application of, clearly established law; and did not rest on an unreasonable determination of the facts.

The panel expanded the certificate of appealability to cover Dixon's claim that his Sixth and Fourteenth Amendment rights were violated when he was shackled and subject to electronic restraints during the trial. As to that claim, the panel held that the Arizona Supreme Court's determination that Dixon was not prejudiced because the jury did not see the restraints was neither an unreasonable determination of the facts nor an application of *Deck v. Missouri*, 544 U.S. 622 (2005), contrary to clearly established federal law. The panel held that in holding in the alternative that any error under *Deck* was harmless, the Arizona Supreme Court did not apply *Chapman v. California*, 386 U.S. 18 (1967), in an objectively unreasonable manner. The panel held that the Arizona Supreme Court's factual conclusions regarding the visibility of the restraints were not unreasonable.

The panel declined to expand the COA as to other issues.

## COUNSEL

Paula Kay Harms (argued) and Amanda C. Bass, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Myles A. Braccio (argued) and John Pressley Todd, Assistant Attorneys General; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondents-Appellees.

## OPINION

THOMAS, Chief Judge:

An Arizona jury convicted Clarence Wayne Dixon of the 1977 murder of Deana Bowdoin and imposed the death penalty. Dixon appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. We review a district court's denial of a habeas corpus petition de novo, *Hall v. Haws*, 861 F.3d 977, 988 (9th Cir. 2017), and we affirm. We expand the certificate of appealability ("COA") as to Dixon's claim that his rights were violated under the Sixth and Fourteenth Amendments when he was shackled and subject to electronic restraints during the trial. We affirm the district court's denial of the petition on that issue.

I

The factual and procedural history of this case spans over four decades and has been discussed at length by Arizona state courts and federal courts. A summary of the history relevant to resolution of the claims before us follows.

A

In June 1977, Dixon struck a teenage girl with a metal pipe. *Dixon v. Ryan* (*Dixon II*), No. CV-14-258-PHX-DJH, 2016 WL 1045355, at *4 (D. Ariz. Mar. 16, 2016) (order) (unpublished decision). Dixon was charged with assault with a deadly weapon in Maricopa County Superior Court. *Id*. at *4.

The trial court appointed two psychiatrists, Drs. Bendheim and Tuchler, to evaluate Dixon, as then required by Rule 11 of the Arizona Rules of Criminal Procedure. *Id*. Both doctors determined that Dixon was not competent to stand trial, noting his depression and difficulty communicating. Both doctors opined that Dixon suffered from "undifferentiated schizophrenia." Dr. Benheim opined that Dixon would be competent to stand trial within "two to six months." Dr. Tuchler recommended treatment in a state hospital, and opined that Dixon "may become competent to stand trial." Thereafter, the Superior Court determined that Dixon was not competent to stand trial and committed him to the Arizona State Hospital for competency restoration.

Approximately six weeks later, a third psychiatrist, Dr. Marchildon, reported that Dixon was competent to stand trial, reasoning that Dixon's "mental condition substantially differ[ed]" from the condition described by Drs. Bendheim

and Tuchler. Dr. Marchildon noted that Dixon's affect was appropriate, his insight and judgment were satisfactory, and he "displayed no behavior or ideation which would indicate mental illness." Dr. Marchildon further determined that Dixon understood the charges against him and the legal proceedings.

Dixon thereafter appeared before the Superior Court, waived his right to a jury trial, and agreed the case should be determined on the submitted records. The court found Dixon not guilty of the assault by reason of insanity and ordered Dixon released pending civil proceedings on January 5, 1978.

The next day, Deana Bowdoin was found dead in her apartment, strangled with a belt and stabbed several times. Investigators found semen in Deana's vagina and on her underwear, but were unable at that time to match the DNA profile to a suspect.

In June 1985, Dixon assaulted a Northern Arizona University student in Flagstaff, Arizona. *State v. Dixon*, 735 P.2d 761, 762 (Ariz. 1987). Dixon was convicted of aggravated assault, kidnapping, sexual abuse, and four counts of sexual assault and was sentenced to seven consecutive life sentences. *Id.* The victim initially reported the incident to the University Police Department. *Id.* The University officers assisted in the investigation and transmitted an "attempt to locate" call after the victim provided a description of the assailant.

In 2001, a police detective compared DNA recovered in the investigation of Bowdoin's 1978 murder against a national database. The profile matched Dixon, then an

Arizona state inmate whose DNA had been collected in the 1985 sexual assault investigation.

B

In November 2002, a grand jury indicted Dixon on the charge of first-degree premeditated murder, or, in the alternative, first-degree rape and felony murder, for Bowdoin's murder.

The State filed notice of its intent to seek the death penalty if Dixon were convicted of first-degree murder. Following the State's notice of intent, public defenders Liles and Simpson were appointed to represent Dixon. For all capital defendants, Arizona law provided automatic prescreening evaluation for competency, sanity, and intellectual disability. Ariz. Rev. Stat. §§ 13–753 to 754. Dixon's counsel objected to the prescreening evaluation, which was never performed.

In July 2003, defense counsel informed the trial court it might take longer than usual to compile mitigation evidence because Dixon had spent his early life on the Navajo Reservation. Defense counsel estimated that the mitigation specialist would need a year to conduct a complete investigation. The court initially set the trial date for June 15, 2004. Defense counsel later filed a Notice of Possible Insanity Defense.

In April 2004, defense counsel estimated the mitigation investigation could be completed in five months if the case were assigned to a new specialist. The court granted the defense motion for a continuance on these grounds and vacated the June 2004 trial date. After a new mitigation

specialist was assigned to the case, the court extended the deadline for disclosure of mitigation evidence to January 2005. In April 2005, defense counsel informed the court and the State that Dixon would not be pursuing an insanity defense.

In October 2005, Dixon filed a motion for change of counsel, explaining that his counsel had informed Dixon that they could not file a motion he requested, despite previously agreeing to file the motion in exchange for his cooperation in the preparation of his defense. Dixon believed that the DNA evidence linking Dixon to the murder should be suppressed as fruit of the poisonous tree because it was obtained in connection with his 1985 assault conviction. The 1985 conviction itself was invalid, Dixon believed, because the campus police lacked the authority to investigate. Defense counsel informed Dixon that they could not file the motion on Dixon's behalf because Dixon's theory was not viable. The court held a hearing, at which Dixon acknowledged that a different attorney may likewise refuse to file the motion, at which point he would proceed pro se. The court then denied the motion to substitute counsel, but advised Dixon that he could request to proceed pro se.

In February 2006, Dixon moved to waive his right to counsel and to represent himself. The court granted Dixon's request after engaging in a colloquy with Dixon regarding whether his request to represent himself was knowing, voluntary, and intelligent. The court questioned Dixon's competency. Dixon informed the court that, although he previously underwent Rule 11 competency proceedings in 1977, he was not aware of any current mental health issues that would prevent him from proceeding to trial. The court also asked Simpson, Dixon's counsel at the time, if he knew

of any mental health issues "that would make this court's decision as to whether to grant the waiver of right to counsel in jeopardy," but Simpson denied knowledge of any reason why Dixon should not be allowed to waive counsel.

Before deciding the motion, the court confirmed that Dixon wished to represent himself and give up his right to counsel, that Dixon understood trial counsel could "be of great benefit" to him, that Dixon had the right to an attorney and that the court could appoint an attorney if he could not afford one, that Dixon understood the charges against him, and that Dixon understood that the potential penalties for the crime included death or life imprisonment.  The court determined that Dixon "knowingly, intelligently, and voluntarily waived" his right to be represented by an attorney, but appointed Simpson as advisory counsel.  The court thereafter granted Dixon's request for a paralegal and a mitigation specialist.  Simpson served as advisory counsel until the court appointed Kenneth Countryman and Nathanial Carr III, who served as advisory counsel through Dixon's trial and sentencing.

Dixon subsequently filed a motion to suppress the DNA evidence linking him to the murder based on his theory that the campus officers lacked authority to investigate. The court denied the motion.  Dixon filed a motion for change of judge based on the denial of the motion to suppress, which the court also denied.  Dixon continued to pursue his theory in a special action, eventually seeking review, unsuccessfully, in the Arizona Supreme Court.

When Dixon was granted permission to represent himself in March 2006, the court set the trial for October 18, 2006. In September 2006, Dixon informed the court his mitigation

evidence would not be ready for another nine months to a year, and the court continued the trial to June 25, 2007, "a date certain." In May 2007, Dixon informed the court his mitigation evidence would not be ready for the June trial date and requested a continuance. The trial was rescheduled for August 2007.

In late August 2007, Dixon moved for a continuance until the last week of January 2008. In support, Dixon raised the turnover among prior mitigation specialists, the loss of a number of documents compiled by the prior specialists, difficulties communicating with the current specialist and experts due to his incarceration, and overall delays due to his incarceration. The court set the trial date for September 13, 2007, but subsequently reset the trial for November 13, 2007.

On November 8, 2007, Dixon moved for a three-month continuance, until March 2008. Dixon attached a letter from the current mitigation specialist, Tyrone Mayberry, in which Mayberry informed Dixon that the mitigation investigation was not yet complete and that Dixon could not proceed to trial with the mitigation incomplete. Dixon also attached a letter addressed to his advisory counsel from the office of Dr. Gaughan, a psychologist. In the letter, Dr. Gaughan indicated that he had been unable to reach Dixon's mitigation investigator or advisory counsel and expressed concern about the lack of communication given the seriousness of the case.

The trial court denied Dixon's motion, reasoning that the case was five years old and that the defense mitigation work had been "on going for well over four years." Throughout trial, Dixon maintained a "standing objection" that he was not prepared to proceed.

At the time of Dixon's trial, Maricopa County required in-custody defendants to wear leg brace and stun belt restraints while in court. Before trial, Dixon filed a motion to forgo use of the leg brace to enable him to move freely about the courtroom. The court denied Dixon's motion based on the jail policy.

The court warned Dixon of the possibility that the jury might infer the presence of the restraints, which "could be prejudicial," and suggested that Dixon either remain seated in the presence of the jury or position himself at the podium before the jury entered the courtroom. Dixon again proposed that he wear the stun belt only, and not the leg brace, but the trial court rejected that option.

At a conference with the court, Dixon acknowledged the risk that the jury might draw an inference from his movement that he might be wearing restraints, and the trial court determined that Dixon's decision to use the podium to examine witnesses was knowing, voluntary, and intelligent. However, over the course of the trial, the court noted to Dixon several times that the outline of the stun belt was visible to the court. The judge instructed Dixon that he should try not to turn his back to the jury or bend over so as to minimize the visibility of the restraints.

The judge also warned Dixon twice that the leg brace would cause him to walk in a stilted manner. Dixon expressed concern that if the officers failed to apply the brace to the same leg each day, the jury would "be confused . . . [if the jury were to] see I'm limping on my left side, and one day they see me limping on my right side." The trial judge agreed to instruct the deputies to make sure that Dixon's leg brace was consistently applied to Dixon's right leg. Dixon alerted

the court one morning that deputies had brought only a left-leg brace. The trial judge agreed to change the brace out over the noon hour and to remind deputies to use the right-leg brace.

C

The jury convicted Dixon of both premeditated and felony murder on January 15, 2008. Prior to the penalty phase, Dixon again informed the court that his mitigation investigation was not complete. Dixon's advisory counsel informed the court that, although the mitigation specialist still required additional time to complete his investigation of Dixon's social history, a "substantial amount of mitigation . . . could be presented" regarding Dixon's "appreciation for the wrongfulness of his conduct, family instability, parental instability, mental disorders, mental health and substance [abuse] issues." Dixon's advisory counsel informed the court that the defense had four experts approved and retained with regard to mental health and family history, as well as a number of documents regarding Dixon's life. Advisory counsel represented to the court that they had informed Dixon that they would present the evidence with the help of the mitigation specialist, but that Dixon had chosen to present only one expert witness. Dixon asserted that he could not present mitigation evidence because the investigation was not complete. Dixon claimed that he had met with only one psychologist on two occasions and that the psychologist had been unprepared.

At sentencing, the State argued that the death penalty was warranted because of four aggravating factors: (1) Dixon had previously been convicted of another offense for which, under Arizona law, a sentence of life imprisonment was

imposed; (2) Dixon committed the offense in an especially heinous manner; (3) Dixon committed the offense in an especially cruel manner; and (4) Dixon committed the offense in an especially depraved manner.

Dixon presented only one mitigation witness. The witness, a former warden who reviewed Dixon's prison record, testified that, in his opinion, the correctional system could manage Dixon if he were sentenced to life imprisonment.

The jury determined that the State proved three aggravating factors beyond a reasonable doubt: (1) Dixon had been convicted of another offense for which, under Arizona law, a sentence of life imprisonment was imposed (the 1985 assault of the NAU student); (2) Dixon committed the offense at issue in an especially heinous manner; and (3) Dixon committed the offense in an especially cruel manner. The jury unanimously determined that Dixon should be sentenced to death.

The Arizona Supreme Court affirmed Dixon's conviction and sentence on direct appeal. *State v. Dixon* (*Dixon*), 250 P.3d 1174, 1185 (Ariz. 2011). The United States Supreme Court denied Dixon's petition for certiorari.

D

Represented by counsel, Dixon filed a petition for post-conviction relief in the Arizona Superior Court. Dixon raised three claims: (1) that the Arizona Supreme Court deprived Dixon of his right to a fair sentencing and due process when it affirmed his death sentence; (2) that Dixon received ineffective assistance of counsel for his trial counsel's failure

to challenge Dixon's competency to waive counsel; and (3) that Dixon was deprived of effective representation from his advisory counsel for failure to challenge Dixon's competency to waive counsel, inform the court of Dixon's mental illness, and develop mitigation evidence relating to Dixon's mental health.

In support of his competency claims, Dixon offered the report of Dr. Toma. Between April and June 2012, Dr. Toma performed four neuropsychological and psychological evaluations of Dixon and diagnosed Dixon with schizophrenia, paranoid type, despite Dixon's "adaman[ce] that he [did] not suffer from a mental illness." Dr. Toma determined that Dixon was not capable of representing himself and that his competence should have been questioned. Dixon also offered a report by Dr. Patino, a psychiatrist who performed a psychiatric evaluation and who concluded that Dixon suffered from chronic paranoid schizophrenia, noting Dixon's paranoia and poor insight. Dixon also submitted the report of Dr. Wu, who conducted a PET scan in October 2012. The results were consistent with schizophrenia and brain damage.

The court dismissed the petition without an evidentiary hearing. The court determined that trial counsel's performance was neither deficient nor prejudicial and that Dixon had no constitutional right to effective assistance of advisory counsel. Dixon petitioned the Arizona Supreme Court for review; his petition was denied.

E

Dixon filed a petition for writ of habeas corpus in the United States District Court for the District of Arizona. The

district court denied the petition, vacated the stay of Arizona's warrant of execution, and granted a certificate of appealability on three of Dixon's thirty-six claims: (1) Claim 1, alleging ineffective assistance of counsel for trial counsel's failure to challenge Dixon's competence to waive counsel without a hearing; (2) Claim 3(A), alleging that the trial court erred when it found Dixon competent to waive counsel; and (3) Claim 9, alleging that the trial court violated Dixon's Eighth and Fourteenth Amendment rights when it denied his final motion for a continuance to allow him to develop further mitigation evidence.

Dixon now appeals the district court's denial of his habeas petition. In addition to the three certified issues, Dixon raises three uncertified arguments: (1) the trial court violated Dixon's Sixth and Fourteenth Amendment rights when it required that he wear visible shackles in the presence of the jury without making an individualized determination that an essential state interest justified the restraints; (2) Dixon's advisory standby counsel violated Dixon's Sixth and Fourteenth Amendment rights by failing to challenge Dixon's competency before the trial court; and (3) the trial court violated Dixon's Sixth, Eighth, and Fourteenth Amendment rights by failing to instruct jurors during the penalty phase that they must find the aggravating factors outweighed the mitigating circumstances beyond a reasonable doubt in order to impose a sentence of death.

II

Dixon's habeas petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d). AEDPA limits "the availability of federal habeas relief . . . with respect to claims

previously 'adjudicated on the merits' in state-court proceedings." *Harrington v. Richter*, 562 U.S. 86, 92 (2011). The statute "bars relitigation" of such claims subject only to two exceptions. *Id.* at 98. Under AEDPA, federal habeas relief remains unavailable unless the state adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d), a state prisoner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Under § 2254(d)(1), "an unreasonable application of federal law is different from an *incorrect* application of federal law." *Id*. at 101 (citations omitted). So long as "fairminded jurists could disagree," with respect to a state court's determination that a claim lacks merit, federal habeas relief will not be granted. *Id*. at 101 (citation omitted).

Similarly, under § 2254(d)(2), a state court's factual determination is "not unreasonable merely because the federal habeas court would have reached a different conclusion." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[Section] 2254(d)(2) requires that [the court] accord the state trial court substantial deference." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015). "A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them." *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) (quoting *Brumfield*, 135 S. Ct. at 2277).

Even where the state court unreasonably applied federal law or unreasonably determined a critical fact, the petitioner is not entitled to relief unless the habeas court "has 'grave doubt about whether'" the constitutional error "had [a] 'substantial and injurious effect or influence'" on the jury's verdict; the petitioner must establish "actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (citations omitted).

III

A

The district court properly held that Dixon's Sixth Amendment right to effective assistance of counsel was not violated when his trial counsel elected not to challenge Dixon's competency to waive counsel, despite counsel's knowledge that Dixon had a history of mental health issues. Dixon contends that, but for counsel's deficient performance, there is a reasonable probability that he would not have been allowed to waive counsel and the result of the proceedings would have been different. Dixon argues that the Arizona

Superior Court's denial of his petition for post-conviction relief ("PCR") thus rested on both an unreasonable application of the clearly established ineffective assistance of counsel standard and an unreasonable determination of facts.

An ineffective assistance of counsel claim is measured by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner "must show that counsel's performance was deficient" and that "the deficient performance prejudiced" the petitioner. *Id.* at 687. This inquiry is "highly deferential." *Id.* at 689.

*Strickland*'s first prong requires a showing that counsel's performance "fell below an objective standard of reasonableness" at the time of the trial. *Id.* at 688. Defense counsel is "strongly presumed to have rendered adequate assistance" and, for a petitioner to prevail, must have "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687, 690. With respect to the prejudice prong, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

More specifically, to succeed on a claim that counsel was ineffective for failing to move for a competency hearing, there must be "sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt defendant's competency" and "a reasonable probability that the defendant would have been found incompetent." *Hibbler v. Benedetti*, 693 F.3d 1140, 1149–50 (9th Cir. 2012) (quoting *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011)).

In the AEDPA context, moreover, the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which is "different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. Under this "doubly deferential" standard, the court asks "whether it is possible fairminded jurists could disagree that [the state court's decision is] inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102. Accordingly, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is . . . difficult." *Richter*, 562 U.S. at 105.

The Arizona Superior Court correctly identified *Strickland* as the applicable standard by which to measure Dixon's ineffective assistance of counsel claim. The court ruled that Dixon had not demonstrated either deficient performance or prejudice. In reaching this conclusion, the court—presided over by the same judge who presided over the Bowdoin murder trial—explained that it was aware at the time Dixon moved to waive counsel "of information that placed [Dixon's] mental health at issue," thus "counsel could not have been ineffective in failing to give the [c]ourt information it already had." The court further recalled Dixon's acknowledgment during the colloquy of his 1977 Rule 11 competency proceedings, and noted that both Dixon and counsel agreed that Dixon "had no mental problems that would place his ability to waive the right to counsel in jeopardy." The court also noted that Dixon "was adamant that he would not submit to [a competency] evaluation," and the court observed Dixon "to be able to adequately advance his positions" and to be "cogent in his thought processes, lucid in argument, and always able to respond to all questions with appropriate answers." Ultimately, the court found that

Dixon's "waiver of counsel was a knowing, voluntary, and intelligent decision on the part of a competent individual."

To determine whether the Arizona court's application of *Strickland* was unreasonable, we look to evidence in the record of counsel's performance to decide "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105. Specifically, we examine the record to decide whether it was reasonable for the Arizona Superior Court to determine that the record lacked "sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt defendant's competency" or "a reasonable probability that the defendant would have been found incompetent." *Hibbler*, 693 F.3d at 1149–50.

Although two doctors opined in 1977 that Dixon suffered from schizophrenia and was not competent to stand trial, nearly 30 years passed between those evaluations and Dixon's 2006 waiver of counsel. Further, the two evaluations cited Dixon's depression and indicated that competency restoration was possible. In fact, a few weeks after the 1977 incompetency determination, a third psychiatrist determined that Dixon's mental health status had significantly changed, that Dixon had been restored to competency, and that Dixon was competent to stand trial. With respect to the 1985 assault and resulting conviction, it does not appear from the record that Dixon's competency or mental health was at issue. The 1977 evaluations and the 1978 not guilty by reason of insanity verdict thus shed little light on Dixon's competence at the time he chose to waive counsel in 2006.

In fact, the record contains no evidence of competency issues at any time throughout the course of these proceedings. The record instead demonstrates that, at the time Dixon

sought to represent himself, Dixon understood the charges against him and the potential sentences, he was able to articulate his legal positions and respond to questions with appropriate answers, and that Dixon demonstrated rational behavior. As to Dixon's continued interest in the DNA suppression issue (which Dixon cites as an indication that he was not competent to waive counsel), Dixon's interest in the issue was not so bizarre or obscure as to suggest that Dixon lacked competence.

The 2012 reports Dixon produced in support of his PCR petition do not compel a contrary conclusion. In addition, because they are necessarily retrospective, they likewise fail to illuminate Dixon's competence during the relevant time period. Dr. Toma's opinion, in particular, that Dixon was not capable of representing himself, does not render unreasonable the Arizona court's conclusions in light of a record that demonstrates that Dixon had mental health issues but had previously been restored to competency.

The record supports the conclusions of the state court. The record reflects that Dixon's prior temporary incompetence was depression-related and readily apparent in Dixon's demeanor, communication, and affect. Dixon displayed no such issues before the trial court. When the evidence of Dixon's prior mental health issues is examined through AEDPA's deferential lens, the state court's application of *Strickland* was not unreasonable, because the evidence before the trial court was temporally remote and inconclusive. Likewise, although reasonable minds may disagree about the import of Dixon's past incompetency, the record does not contain any evidence that Dixon was not competent between 2002 and 2006, the time period particularly relevant to the murder trial and Dixon's waiver

of counsel. Thus, the record demonstrates that the Arizona Superior Court did not rely on an unreasonable determination of the facts. We therefore affirm the district court's denial of Dixon's petition for a writ of habeas corpus as to the first certified issue.

B

The district court properly concluded that Dixon's due process rights were not violated by the state trial court's failure to hold a competency hearing *sua sponte*. Dixon argues that substantial evidence before the court raised a good faith doubt about his competence and that the trial court's failure to hold a hearing before finding him competent to represent himself violated his right to due process. Dixon also argues that the post-conviction court failed to hold an evidentiary hearing, contrary to clearly established federal law, and failed to acknowledge expert reports which indicated that he suffered from some form of schizophrenia, brain damage, and other disorders, reflecting an unreasonable determination of the facts. Dixon again relies on the two 1977 competency evaluations, the 1978 not guilty by reason of insanity verdict, and his continued pursuit of the motion to suppress in support of his argument.

Although a criminal defendant has a Sixth Amendment right to self-representation, the defendant must be competent to waive counsel. *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (citing *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938)). The standard a court must apply to a defendant's request for self-representation differs from the standard for competence to stand trial. *United States v. Ferguson*, 560 F.3d 1060, 1061–62, 1067–68 (9th Cir. 2009) (citing *Indiana v. Edwards*, 554 U.S. 164, 176–77 (2008)); *compare Godinez*,

509 U.S. at 396 (competence to stand trial requires a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him" (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam))).

The Supreme Court has not set forth a specific standard for a criminal defendant's competence to exercise his right to self-representation, however, instead leaving the determination of whether the defendant is competent to conduct trial proceedings to the trial court's discretion. *Edwards*, 554 U.S. at 175–76. The *Edwards* court reasoned that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id*. at 177. Thus, a defendant may be in the "gray area," where he is competent to stand trial, but suffers from a mental impairment such that he is not competent to conduct trial proceedings. *Id*. at 172–77.

Due process "requires that a state court initiate a hearing on the defendant's competence to waive counsel whenever it has or should have a good faith doubt about the defendant's" competence. *Harding v. Lewis*, 834 F.2d 853, 856 (9th Cir. 1987). "A good faith doubt exists when there is substantial evidence of incompetence." *Id.* (citing *United States v. Veatch*, 674 F.2d 1217, 1223 (9th Cir. 1981)). Evidence of incompetence "includes, but is not limited to, a history of irrational behavior, medical opinion, and the defendant's behavior at trial." *Id.*

Dixon cannot overcome the AEDPA deference that we are required to apply to the Arizona Superior Court's

rejection of this argument. Although the record demonstrates Dixon's history of mental health and competency issues, the record also contains evidence of Dixon's competence at the time he moved to represent himself, as discussed above. Even under a higher competency standard for self-representation, the PCR court's determination without a hearing that Dixon was competent to waive counsel and represent himself was not an unreasonable determination of the facts, nor was it contrary to clearly established federal law. Dixon's actions before the trial court indicated that he understood the consequences of waiving his right to counsel and that he possessed sufficient intelligence and competence to participate in the proceedings. Dixon was responsive and rational before the trial court, and he expressed himself effectively. The court noted that Dixon was able to articulate and advance his positions and to understand and respond appropriately to questions. Although there was evidence that Dixon lacked competence to stand trial in 1977, the record does not demonstrate that this evidence of past incompetency presents "substantial evidence" giving rise to "a good faith doubt" as to Dixon's competency to represent himself in 2006. We affirm the district court's denial of Dixon's petition as to the second certified issue.

## C

The district court properly held that the Arizona Supreme Court's opinion concluding that the trial court did not abuse its discretion in denying Dixon's final continuance motion was neither contrary to, nor an unreasonable application of, clearly established federal law. The court also did not err in holding that the Arizona Supreme Court's determination did not rest on an unreasonable determination of the facts.

Dixon raised these claims on direct appeal to the Arizona Supreme Court, and the Arizona Supreme Court rejected the claims on the merits. That court stated that "Dixon was given more than four years to develop mitigation" and that the trial court did not err in considering the rights of the victim's parents and Dixon's right to a speedy disposition. Dixon argues that the Arizona Supreme Court's conclusion is not entitled to AEDPA deference because it (1) relied on inaccurate representations made by Dixon's advisory counsel regarding the status of Dixon's mitigation development; (2) omitted evidence that Dixon's mitigation case was not close to being complete; and (3) failed to address the impediments Dixon faced in developing his mitigation case.

1

Dixon argues that the Arizona Supreme Court's decision was contrary to, and unreasonably applied, clearly established federal law because it ignored the specific circumstances Dixon faced and precluded Dixon from presenting mitigating evidence that a life sentence, rather than the death penalty, was warranted. Specifically, Dixon asserts that the Arizona Supreme Court's decision violated Supreme Court precedent by focusing primarily on the amount of time during which the mitigation investigation had been ongoing, while ignoring the individual impediments Dixon faced in preparing his mitigation case. Clearly established federal law regarding the denial of a continuance requires that the state court consider the relevant circumstances before denying a continuance. *Ungar v. Sarafite*, 376 U.S. 575, 589–90 (1964). However, only "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v.*

*Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar*, 376 U.S. at 589).

The Arizona Supreme Court's conclusion that the trial court appropriately considered Dixon's circumstances in denying the continuance does not amount to an unreasonable application of *Morris* or *Ungar*. Although the trial court cited the overall length of the case in denying the motion, the trial court also cited the interests of the victims, and the mitigation investigation done by prior counsel and mitigation specialists. The trial court referenced the overall length of the case and weighed the timely resolution of the case, among other factors, so the denial was not an "unreasoning" or "arbitrary 'insistence'" on an expeditious resolution of the case. *Morris*, 461 U.S. at 11 (quoting *Ungar*, 376 U.S. at 589).

As to clearly established federal law governing the role of mitigating evidence in capital sentencing, under the Eighth and Fourteenth Amendments, a sentencer in a capital case may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis omitted); *see also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *Eddings v. Oklahoma*, 455 U.S. 104, 109 (1982). Because Dixon contends that the denial of the final motion to continue cut short the mitigation investigation and denied him the opportunity to further investigate potential areas relevant to mitigation, we consider whether the denial of the continuance precluded the jury from considering or giving effect to any relevant mitigation evidence.

Dixon himself determined what mitigation evidence to present to the jury and was given an opportunity to present the evidence during the penalty phase. Dixon acknowledged that he did not want to present mitigating evidence related to his family history and instead opted to call only one expert witness to present evidence about Dixon's history in prison and the ability of the prison system to control him. Although his mitigation investigation may have been incomplete, the denial of the final continuance did not preclude the jury from considering or giving mitigating weight to any category of evidence in the way the sentencers were precluded from weighing the mitigating evidence in *Lockett*, *Abdul-Kabir*, and *Eddings*.

As distinguished from the cases cited by Dixon, the jury here was not precluded, as a matter of law, from considering any mitigation evidence. Neither the sentencing statute, nor the trial judge's instructions, prevented the jury from considering mitigating evidence or giving mitigating weight to Dixon's character and record or the circumstances of the offense. *See Lockett*, 438 U.S. at 593–94, 604–06 (holding that the Ohio death penalty statute, which required imposition of the death penalty once a defendant was found guilty of aggravated murder with at least one of seven specified aggravating factors, unless one of three specified mitigating factors was established by a preponderance of the evidence, violated the Eighth and Fourteenth Amendments because the statute limited the range of mitigating factors that the sentencer could consider); *see also Abdul-Kabir*, 550 U.S. at 237–244, 263–64 (holding that, although defendant presented mitigating evidence, the trial judge's refusal to give defendant's requested instructions prevented the jury from considering the mitigating evidence); *Eddings*, 455 U.S. at 110, 112–14 (the court's determination that, as a matter of

law, it was unable to consider Eddings' violent family history, had the same effect as an instruction to the jury to disregard Eddings' mitigating evidence, and violated the Eighth and Fourteenth Amendments by precluding the sentencer from considering Eddings' character).

2

The district court also properly concluded that the Arizona Supreme Court's determination that the trial court did not abuse its discretion in denying the final request for a continuance did not rest on an unreasonable determination of the facts. In his final motion to continue, Dixon detailed a number of reasons why a three month continuance was necessary. Specifically, Dixon highlighted a change in mitigation specialists, delays caused by his incarceration, an overall inability to access legal resources while incarcerated, and an inability to schedule interviews with potential witnesses. In support of his motion, Dixon attached a letter from his current mitigation specialist which expressed the view that there was "no way ethically to proceed to trial." The specialist cited delays in reviewing mitigation documents and interviewing witnesses and the appointment of expert witnesses.

Dixon now argues that the Arizona Supreme Court's decision is premised on an unreasonable factual determination because the court relied on an inaccurate representation made by Dixon's advisory counsel that a substantial amount of mitigation evidence had already been prepared, omitted evidence that the mitigation case was not complete, and unreasonably determined that the trial court appropriately considered Dixon's interests.

Although Dixon asserted that he faced a number of delays in and impediments to completing a thorough mitigation investigation and that the mitigation specialist indicated he had not yet completed the investigation, the Arizona Supreme Court did not rely on an unreasonable determination of the facts in concluding that the trial court did not abuse its discretion by denying the continuance. Rather, the court relied on the representations made to it by Dixon's advisory counsel as to the mitigation evidence available. Although the advisory counsel's representations conflicted with Dixon's and the mitigation specialist's opinions, that the Arizona Supreme Court gave greater weight to the advisory counsel's representations does not amount to an unreasonable determination of the facts. Under the relevant standard, reasonable minds might disagree as to which statements the court should have credited, especially because advisory counsel recognized the incomplete status of the investigation in their representations regarding how much of the mitigation investigation had been completed.

The Arizona Supreme Court also acknowledged the many continuances granted by the trial court to allow Dixon to develop more mitigation evidence, the overall length of the case, Dixon's interests, and the victims' rights. Consideration of these factors is supported by the record, and the finding that the trial court did not abuse its discretion in denying the continuance was not unreasonable. For its part, the trial court reviewed a chronology of the case, the mitigation specialist's work on the case, and the victims' objections to a continuance. The trial court and the Arizona Supreme Court ultimately gave more weight to the overall length of the case, the victim's interests, and the advisory counsel's representations than to Dixon's claimed delays and impediments. The PCR court's ultimate determination that

the trial court's decision was not an abuse of discretion did not rest on an unreasonable determination of the facts.

IV

A

When the district court issues a COA on some, but not all, of the issues the petitioner wishes to raise on appeal, uncertified issues raised on appeal "will be construed as a motion to expand the COA." *Murray v. Schriro*, 745 F.3d 984, 1002 (9th Cir. 2014) (citation omitted). Under AEDPA, a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a COA. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Murray*, 745 F.3d at 1002. The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. The petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; *or* that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (citation and brackets omitted). However, the threshold inquiry for certification is a "modest" one. *Id.* at 1027; *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

We conclude that Dixon has satisfied this standard as to his claim that the state trial court denied his constitutional right to a fair trial by requiring him to wear restraints during trial. 28 U.S.C. § 2253(c)(2). We deny the motion to expand the COA as to the other issues.

B

"The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Deck v. Missouri*, 544 U.S. 622, 626 (2005). The Constitution also "forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant." *Id.* at 624 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)). This "constitutional requirement, however, is not absolute." *Id.* at 633. In the exercise of his or her discretion, a judge may take into account "special circumstances, including security concerns, that may call for shackling . . . [b]ut any such determination must be case specific." *Id.*

The Arizona Supreme Court acknowledged that the trial court failed to make the requisite "particularized finding of the need for security measures" before requiring Dixon to wear stun belt and leg brace restraints. *Dixon*, 250 P.3d at 1180. Nevertheless, the Arizona Supreme Court determined that Dixon could not succeed on his restraint claim because he failed to show that the jury actually saw the restraints. *Id.* at 1181. Furthermore, the court determined that any improperly-imposed visible restraint would have constituted harmless error because it was "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* (quoting *Hymon v. State*, 111 P.3d 1092, 1099 (Nev. 2005)).

The Arizona Supreme Court adjudicated Dixon's guilt-phase shackling claims on the merits on direct appeal. *Dixon*,

250 P.3d 1179–82. We treat Dixon's penalty-phase restraints claims as adjudicated on the merits as well; although the Arizona Supreme Court did not specifically address them, they are identical to Dixon's guilt-phase claims. In addition, "[i]f a federal claim [is] presented to the state court and the state court denie[s] all relief without specifically addressing the federal claim, 'it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1131 (9th Cir. 2014) (quoting *Richter*, 562 U.S. at 99). Section 2254(d) applies "even where there has been a summary denial." *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011). Habeas relief is therefore available on these claims only if Dixon can overcome AEDPA deference. Dixon argues that he has overcome AEDPA under both § 2254(d)(1) and (d)(2).

1

Dixon contends that the Arizona Supreme Court contravened clearly established federal law "[b]y placing the burden on Dixon to prove that his leg restraint was not visible and that he was therefore not prejudiced by his erroneous shackling."

The Arizona Supreme Court correctly identified *Deck* as controlling federal authority and framed the "central issue" as "whether the restraints" used on Dixon "were visible" to the jury. The court determined that Dixon provided "no evidence . . . that the jury either saw the brace or inferred that Dixon wore one" and "the reported decisions correctly treat a leg brace worn under clothing as not visible in the absence of evidence to the contrary." Dixon argues that requiring him to prove that the jury saw the restraints impermissibly shifted

the burden of the harmless error analysis to him, contravening *Chapman v. California*, 386 U.S. 18 (1967).

Dixon relies on *Dyas v. Poole*, 317 F.3d 934 (9th Cir. 2003) (per curiam), to support his claim. In *Dyas*, "[t]he California Court of Appeal held that keeping Dyas shackled during trial was constitutional error . . . [but] then ruled . . . that the error was harmless because the trial court had 'found' that the jurors would not be able to see the shackles from the jury box." *Id.* at 936. We held that "the state court of appeal held against Dyas the absence of evidence of what the jury could see, which was contrary to the requirement of *Chapman*, 386 U.S. at 24, that the prosecution bear the burden of showing harmlessness beyond a reasonable doubt." *Dyas*, 317 F.3d at 937.

The State inarguably bears the burden to prove harmlessness. *Chapman*, 386 U.S. at 24. Dixon's reliance on *Dyas*, however, improperly conflates the inquiry as to whether the restraints were visible to the jury—which is relevant to whether Dixon has demonstrated a constitutional violation under *Deck*—with the harmless error inquiry, which places the burden on the government to prove that the jury would have found Dixon guilty absent the error. *See Deck* 544 U.S. at 635.[1] While visibility is relevant to both considerations, the question here is whether Dixon was prejudiced under *Deck* by the jury's ability to see the

---

[1] *Dyas* itself is not relevant to our analysis of whether the Arizona Supreme Court unreasonably applied Supreme Court precedent because, as the Supreme Court has "repeatedly pointed out, circuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court." *Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (quoting *Glebe v. Frost*, 135 S. Ct. 429, 430 (2014)).

restraints, which Dixon must show to succeed on his claim. The Arizona Supreme Court's determination that Dixon was not prejudiced because the jury did not see the restraints was neither an unreasonable determination of the facts nor was its application of *Deck* contrary to clearly established federal law. In the alternative, the Arizona Supreme Court held that any error under *Deck* was harmless, and the Arizona Supreme Court did not base its harmless error determination on a lack of visibility. Rather, the court proceeded to analyze harmless error despite its previous determination that the restraints were, in fact, not visible to the jury (and therefore there was no violation of "the rule announced in *Deck*"). *Dixon*, 250 P.3d at 1181. The Court determined that "the DNA evidence" and "the circumstances of the crime" rendered any error resulting from the improper imposition of "visible restraints" harmless. *Id*.

The Arizona Supreme Court did not apply *Chapman* in an objectively unreasonable manner. *See Ayala*, 135 S. Ct. at 2198. Under § 2254(d)(1), "an unreasonable application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (citation omitted). So long as "fairminded jurists could disagree," with respect to a state court's determination that a claim lacks merit, federal habeas relief will not be granted. *Id*. Under this standard, because the Arizona Supreme Court engaged in a harmless error analysis that assumed visibility, Dixon's claim fails.

2

The district court properly concluded that the Arizona Supreme Court's factual conclusions were not unreasonable. "A state court's factual findings are unreasonable if

'reasonable minds reviewing the record' could not agree with them." *Ayala*, 829 F.3d at 1094 (citation omitted).

The Arizona Supreme Court determined that it should treat restraints worn under clothing "as not visible in the absence of evidence to the contrary." *Dixon*, 250 P.3d at 1181. The court explained, with regard to the leg brace, that there was "no evidence" that the brace was visible or that the jury inferred that Dixon was restrained. *Id*. As to the stun belt, the court noted Dixon's failure to object to the stun belt below and explained that, under fundamental error review, Dixon "must show that [the stun belt] was visible to the jury." *Id*. The court concluded that Dixon "ha[d] not met that burden." *Id*. Dixon argues that these factual determinations "patently ignored evidence in the state court record that both the stun belt and leg restraint were, indeed, visible."

Dixon argues that evidence in the record supports that the jury saw or inferred that he was wearing a leg brace. The only evidence in the record regarding the effect of the leg brace on Dixon's gait appears where the court twice warned Dixon that the leg brace *could* cause him to walk "in some sort of stilted fashion" in front of the jury. Dixon expressed concern about the jury's observing him limping on different legs depending on which leg the brace was applied to, which the court attempted to mitigate by asking deputies to consistently use a right leg brace.

None of the evidence presented in the state court proceeding establishes that the state court made an unreasonable factual determination when it ruled that "no evidence" suggested that the brace was visible or that the jury inferred restraint. *Dixon*, 250 P.3d at 1181. First, nowhere in the record does any party suggest or comment that the leg

brace itself actually was visible.  Second, the record suggests no more than the possibility that the jury may have seen Dixon limp.  Even if the jury saw Dixon limp inconsistently, this does not render the Arizona Supreme Court's determination unreasonable, because "reasonable minds reviewing the record" could disagree that this evidence supports a conclusion that the jurors did not actually infer the presence of the brace.  *Ayala*, 829 F.3d at 1094 (citation omitted).

Dixon likewise argues that the trial judge's repeated observations regarding the visibility of the stun belt constituted factual determinations deserving of deference and render the Arizona Supreme Court's subsequent factual determination unreasonable.

The Arizona Supreme Court acknowledged the trial judge's comments that, when Dixon turned his back towards the jury and bent over, the outline of the stun belt protruded, and the belt was "very" and "readily" visible, and the trial court cautioned Dixon several times that it was apparent that Dixon was wearing the belt.  The Arizona Supreme Court dismissed these comments as "speculat[ion] that jurors might be able to see" the belt.  *Dixon*, 250 P.3d at 1181.  The court then determined only that Dixon had not demonstrated that "the jury actually saw the belt or inferred its presence." *Id.* This does not amount to an unreasonable factual determination based on the evidence available to the state court such that "'reasonable minds reviewing the record' could not agree with [it]." *Ayala*, 829 F.3d at 1094 (citation omitted).

For the foregoing reasons, Dixon cannot overcome AEDPA deference on the restraints claims, and we affirm the district court's denial of the petition as to this issue.

V

We affirm the district court's denial of the writ of habeas corpus. We expand the COA to include the question of whether Dixon's constitutional rights were violated at trial through use of restraints, but affirm the district court's denial of the writ on that issue. We decline to expand the COA further.

**AFFIRMED.**